JOHNSON FISTEL, LLP
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonfistel.com
Phong L. Tran, Esq. (SBN 204961)
PhongT@johnsonfistel.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENDOLOGIX, INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No.: 8:17-cv-01155-AB (PLAx) |
| | (Consolidated with: 8:17-cv-01183-AB (PLAx)) |
| This Document Relates To: | (Derivative Action) |
| ALL ACTIONS. | Judge Andre Birotté Jr. |
| | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

By and through his undersigned counsel, Plaintiffs Paul Green and Nick Cocco ("Plaintiffs") bring this shareholder derivative action on behalf of Nominal Defendant Endologix, Inc. ("Endologix" or the "Company"), and against certain officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duties, unjust enrichment and corporate waste. Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Endologix with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, analyst reports, and postings on Endologix's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Nguyen v. Endologix, Inc. et al.*, Case No. 2:17-cv-00017-AB-PLA (C.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Endologix and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Endologix that seeks to redress wrongdoing by the Company's board of directors (the "Board") and certain of its senior officers. From at least April 20, 2016 to the present (the "Relevant Period"), the Individual Defendants breached their fiduciary duties owed to Endologix and its shareholders and committed other violations of law by, *inter alia*, causing the Company to issue materially false and misleading statements and/or omit material information from its public filings and communications with analysts and investors, the disclosure of which would have

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

made such filings and communications not misleading.  By and through the Individual Defendants' violations of law, Endologix has sustained and will continue to sustain damages, including hundreds of millions of dollars in losses to the Company's market capitalization, as well as significant harm to its reputation, goodwill, and standing in the business community.  Moreover, the Individual Defendants' wrongdoing has exposed the Company to millions of dollars in potential liability from the Securities Class Action, and the significant costs incurred (and to be incurred) in connection with the litigation and potential resolution of that action.

2.     Endologix is a medical devices company headquartered in Irvine, California.  Prior to, and continuing throughout the Relevant Period, Endologix's most promising medical product was the Nellix® Endovascular Aneurysm Sealing System ("Nellix EVAS System" or "Nellix"), which was touted as a new and groundbreaking treatment device for abdominal aortic aneurysms.  Traditionally, patients suffering from abdominal aortic aneurysms were treated using invasive, open surgical methods.  Treatment with the Nellix EVAS System, on the other hand, could be rendered using a small medical device, delivered via catheter, without open surgery.  Nellix was therefore marketed as a less invasive alternative to traditional aneurysm treatment, which in turn, minimized the risk of complications and reduced recovery time for patients.

3.     Endologix launched the Nellix EVAS System in Europe on a limited commercial basis in 2013.  Before it could launch Nellix in the United States, Endologix needed to obtain premarket approval, or "PMA," for the device from the Food and Drug Administration ("FDA").  As part of the FDA's PMA process, Endologix was required to collect and submit human clinical and nonclinical data demonstrating the safety and effectiveness of the device.  As such, investors and securities analysts were keenly focused on news concerning the Nellix clinical

3

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**
Lead Case No.: 8:17-cv-01155-AB (PLAx)

trials and the progress the Company was making in obtaining FDA approval for the device.

4.      Prior to the Relevant Period, the Individual Defendants were able to observe whether the Nellix EVAS System was safe and effective for use in thousands of patients in Europe.  As it turned out, many doctors in Europe reported that Nellix was prone to cause a serious problem known as "migration," which occurs when an implanted device moves within human body, or is completely expelled from the body.  Migration can cause catastrophic medical complications in patients, so the fact that doctors in Europe had observed Nellix causing migration in patients raised significant concerns about the device's ultimate safety and efficacy.  As part of the FDA's PMA process, Endologix was required to disclose any reports of adverse events or complaints from the patients in Europe who received treatment with Nellix, including these migrations concerns.

5.      Despite concerns raised in Europe about Nellix's migration problem, the Individual Defendants painted a falsely optimistic picture that premarket approval for Nellix in the United States was inevitable and right around the corner. During the Relevant Period, the Individual Defendants made repeated assurances in the Company's SEC filings and during investor conference calls that clinical trials for the device were yielding positive results and that the Company was "on track" to receive FDA approval by the end of 2016, or the early part of 2017, at the latest.

6.      The narrative that Endologix was on track to receiving FDA approval for the Nellix EVAS System was false and misleading.  Indeed, what investors did not know was that Nellix was plagued by serious safety concerns, including documented migration issues, that were holding up the PMA process.  The Individual Defendants, however, caused the Company to downplay the severity of Nellix's migration problem and instead conveyed to the market that the problem could be easily fixed.

4

7. Toward the end of 2016, it became increasingly clear that Endologix was not on track to receive PMA as previously promised, due to concerns that Nellix was prone to migration. Specifically, on November 16, 2016, the Company shockingly announced that Nellix would not be receiving FDA approval within the stated timeframe. The FDA had requested additional clinical data concerning Nellix, which meant that PMA could not occur until the second quarter of 2018—much later than promised. Following the announcement of the delay, the price of Endologix stock fell $2.02 per share to close at $7.82 per share on November 16, 2016—a decline of over 20.5% from its previous closing price.

8. Months later, on May 17, 2016, Endologix dropped another bombshell revelation—it was no longer seeking FDA approval of the first generation Nellix EVAS System at all. Instead, the Company revealed that it was planning to seek approval of the second generation, or "Gen2" of the device, which would require the Company to conduct altogether new and separate clinical trials—***pushing the timeline for approval all the way out to 2020***.

9. On this shocking news, the price of Endologix stock plummeted 36%, or $2.47 per share, to close at $4.26 on May 18, 2017—falling to its lowest level in several years.

10. The Individual Defendants' false and misleading statements (and other wrongdoing, such as the failure to implement, maintain, or follow adequate internal controls) caused Endologix stock to trade at artificially inflated levels during the Relevant Period. After the revelations concerning Endologix's inability to meet the promised timeframe for FDA approval of Nellix seeped into the market, the Company's stock was hammered by massive sales, driving down the share price from its artificially inflated highs, erasing hundreds of millions of dollars of the Company's market capitalization.

11. The Individual Defendants' misconduct did not end there. During the Relevant Period, Endologix's Board authorized the filing of proxy statements with

5

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

the SEC, which urged stockholders to vote for the re-election of certain directors and approve certain executive compensation proposals, among other proposals. In seeking stockholder votes in accord with the Board's recommendations, the proxy statements misrepresented and/or omitted material information concerning, among other things: (i) the failures of the Board and certain of its Committees to fulfill their duties, including oversight of internal controls and disclosures; (ii) that the Company was misrepresenting the timeframe for which it could obtain FDA approval for Nellix; and (iii) that Nellix was suffering from persistent migration problems that could not be fixed.

12. The Board has not, and will not, commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Endologix for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiffs rightfully bring this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Endologix.

## JURISDICTION AND VENUE

13. Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

14. The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) Endologix maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Endologix occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

16.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

17.     Plaintiff Paul Green is a stockholder of Endologix and has continuously held stock in the Company since February 2016.

18.     Plaintiff Nick Cocco is a stockholder of Endologix and has continuously held stock in the Company since November 2015.

19.     Nominal Defendant Endologix is a Delaware corporation with its principal executive offices at 2 Musick, Irvine, California 92618.  Endologix develops, manufactures, markets, and sells medical devices primarily for the treatment of aortic disorders.  Endologix is traded on the NASDAQ Stock Market under the ticker symbol "ELGX."  As reported in the Company's 10-Q filed with the SEC on November 6, 2017, there were 83,453,710 shares outstanding of Endologix common stock.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

20.     Defendant John McDermott ("McDermott") joined Endologix in May 2008 as its President and Chief Executive Officer ("CEO") and currently serves as the Company's CEO and an independent director.   Beginning in March 2012, McDermott also served as the Company's Chairman of the Board until the Chairman position was formally separated from the CEO position in February 2017.  McDermott is also a defendant in the Securities Class Action.  At all times during the Relevant Period, Endologix paid McDermott a base salary of $572,000.  In 2016, Endologix paid McDermott $3,201,133 in total compensation as an executive of the Company.

21.     Defendant Vaseem Mahboob ("Mahboob") joined Endologix in October 2015 as its Chief Financial Officer ("CFO") and Corporate Secretary and currently serves in those positions for the Company.  Mahboob is also a defendant in the Securities Class Action.  At all times during the Relevant Period, Endologix paid Mahboob a base salary of at least $350,000.  In 2016, Endologix paid Mahboob $1,221,606 in total compensation as an executive of the Company.

22.     Defendant Daniel Lemaitre ("Lemaitre") joined Endologix in December 2009 as an independent director and currently serves as the Company's Chairman of the Board of Directors.  Beginning in March 2014, Lemaitre also served as Endologix's Lead Independent Director until which time he was appointed Chairman of the Board in February 2017.  Lemaitre has also served as Chairman of Endologix's Nominating, Governance and Compliance Committee and as a member of the Company's Audit Committee through at least May 2017.  In 2016, Endologix paid Lemaitre $209,495 in total compensation as a director of the Company.

23.     Defendant Leslie Norwalk ("Norwalk") joined Endologix in May 2015 as an independent director and currently serves on the Company's Board of Directors.   Norwalk has also served on Endologix's Nominating, Governance and Compliance Committee through at least May 2017.  In 2016,

8

Endologix paid Norwalk $156,448 in total compensation as a director of the Company.

24.     Defendant Guido J. Neels ("Neels") joined Endologix in December 2010 as an independent director and currently serves on the Company's Board of Directors.   Neels has also served as Chairman of Endologix's Compensation Committee as well as on the Company's Nominating, Governance and Compliance Committee through at least May 2017.  Neels formerly served on the board of directors of Nellix, Inc., a privately-held medical device company which Endologix acquired in 2010.  Endologix utilized the technology obtained in the Nellix acquisition to develop the Nellix EVAS System.  In 2016, Endologix paid Neels $165,834 in total compensation as a director of the Company.

25.     Defendant Christopher G. Chavez ("Chavez") joined Endologix in February 2016 as an independent director and currently serves on the Company's Board of Directors.   Chavez formerly served as Chairman of the Board of Directors, President and CEO of Trivascular Technologies, Inc., which merged with Endologix in February 2016.  In 2016, Endologix paid Chavez $230,975 in total compensation as a director of the Company.

26.     Defendant Gregory D. Waller ("Waller") joined Endologix in November 2003 as an independent director and currently serves on the Company's Board of Directors.  Waller has also served as Chairman of Endologix's Audit Committee and as a member of the Company's Nominating, Governance and Compliance committee through at least May 2017.  In 2016, Endologix paid Waller $175,227 in total compensation as a director of the Company.

27.     Defendant Thomas C. Wilder, III ("Wilder") joined Endologix in May 2010 as an independent director and currently serves on the Company's Board of Directors.   Wilder has also served on Endologix's Audit and Compensation Committees through at least May 2017.  In 2016, Endologix paid Wilder $153,555 in total compensation as a director of the Company.

9

28.     Defendant Thomas F. Zenty, III ("Zenty") joined Endologix in May 2013 as an independent director and currently serves on the Company's Board of Directors.   Zenty has also served on Endologix's Compensation Committee through at least May 2017.  In 2016, Endologix paid Zenty $151,558 in total compensation as a director of the Company.

29.     Defendants identified in paragraphs 20 through 28 are sometimes referred to herein as the "Individual Defendants."

30.     Defendants identified in paragraphs 20 and 22 through 28 are sometimes referred to herein as the "Director Defendants."

31.     Defendants Lemaitre, Waller, are Wilder are sometimes referred to herein as the "Audit Committee Defendants."

## SUBSTANTIVE ALLEGATIONS

**Endologix's Corporate Background and the Nellix EVAS System**

32.     Endologix develops, manufactures, markets, and sells medical devices for the treatment of abdominal aortic aneurysms in the United States and internationally.  Endologix is globally headquartered in Irvine, California, with over 900 employees worldwide.  Endologix's products are based on two primary platforms:  (1) traditional minimally invasive endovascular aneurysm repair ("EVAR"); and (ii) endovascular aneurysm sealing ("EVAS"), which uses the Company's innovative solution for sealing the aneurysm sac while maintaining blood flow.  Endologix's current EVAS product is the Nellix EVAS System.

33.     Endologix's products are primarily targeted to individuals who suffer from atherosclerosis—a disease resulting in the thickening and hardening of arteries.  Atherosclerosis and is generally attributable to genetics, smoking, high blood pressure, and/or high cholesterol damage and affects 5% to 6% of individuals over the age of 65.

34.     Atherosclerosis reduces the integrity and strength of blood vessel walls, causing the vessel to balloon out—a medical condition known as an

10

"aneurysm."  Aneurysms are commonly diagnosed in the aorta, which is the body's largest artery.  An abdominal aortic aneurysm occurs when a portion of the abdominal aorta bulges into an aneurysm due to the weakening of the vessel wall, which may result in life-threatening internal bleeding upon rupture.  The overall patient mortality rate for ruptured abdominal aortic aneurysms is approximately 80%, making it a leading cause of death in the United States.

35.    Endologix's EVAR and EVAS products were developed as alternatives to traditional methods of treating abdominal aortic aneurysms, which generally involve invasive, open surgical procedures lasting two to four hours.  EVAR and EVAS products, by contrast, use minimally invasive procedures lasting only an hour or two.  In addition, patients who receive EVAR and EVAS treatment typically have quicker recovery times and do not require the lengthy post-surgery convalescence associated with traditional open surgery.

36.    Endologix viewed the treatment of endovascular aortic aneurysms as a significant, multi-billion dollar market opportunity.  To capitalize on this lucrative market, Endologix developed the Nellix EVAS System—a small medical device that could be delivered into the body via catheter and then used to seal the entire aneurysm sac.  According to Endologix, treatment with the Nellix technology substantially reduced the risk of complications associated with aneurysms, including the chance of endoleaks, a serious condition that occurs when blood leaks into the aneurysm sac.

37.    Endologix, therefore, viewed the Nellix EVAS System as a disruptive medical innovation that would enable the Company to capture a large part of the endovascular aneurysm treatment market and therefore propel its growth prospects.  During the May 5, 2015 Deutsche Bank Health Care Conference, Defendant Mahboob highlighted the innovative nature of Nellix, stating "we're trying to redefine the entire endovascular repair into endovascular sealing as we call it."

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

38.     However, before Endologix could commercially launch and market the Nellix EVAS System, the Company needed to obtain FDA approval for the novel medical device.  As a prerequisite for FDA approval, the Company was required to obtain premarket approval ("PMA") for Nellix.

39.     The Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act established three regulatory classes for medical devices.  The three classes (Class I, II, and III) are based on the degree of control necessary to assure that the various types of devices are safe and effective.  The most regulated devices fall within Class III, which include medical devices that support or sustain human life, are of substantial importance in preventing impairment of human health, or present a potential unreasonable risk of illness or injury.  Premarket approval is the FDA's process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices.

40.     PMA is the most stringent type of device marketing application required by the FDA, due to the level of risk associated with Class III devices.  A Class III medical device (such as the Nellix EVAS System) must receive FDA approval of its PMA application prior to the marketing of the device.  PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is indeed safe and effective for its intended use(s).

41.     A PMA application must contain the device's indications for use, defined as "[a] general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for which the device is intended."  21 C.F.R. § 814.20(b)(3)(i).  A device's "indications for use," or "IFU," dictates the patient population that can be treated with the device.  One of the selling points of the Nellix EVAS System was that it potentially had a broad range of use.  For example, during a November 20, 2013 conference call with investors and analysts, Defendant

12

McDermott stated that "we plan to broaden Nellix's indication beyond any of the other endovascular aneurysm devices."

42.     A broad IFU meant not only increased commercial appeal for the product to investors and consumers, but increased market share for the Company. Increased commercial appeal for Nellix also meant increased interest in Endologix stock by investors and a potentially higher Company stock price.

43.     The purpose of the PMA application is to provide the FDA with the requisite information it needs to evaluate the safety and effectiveness of a device. As such, a PMA application submitted to the FDA must include the following information: "An identification, discussion, and analysis of ***any other data, information, or report relevant to an evaluation of the safety and effectiveness of the device*** known to or that should reasonably be known to the applicant from any source, ***foreign or domestic***, including information derived from investigations other than those proposed in the application and from commercial marketing experience." 21 C.F.R. 814.20(b)(8)(ii) (emphasis added). Furthermore, in connection with a PMA application: "It would be appropriate to include … a summary of any adverse experiences reported …" 21 C.F.R. § 814.20(b)(3).

44.     Accordingly, as part of the FDA's rigorous PMA application process, Endologix was required to demonstrate the overall safety and efficacy of the Nellix EVAS System.  Indeed, consistent with the requirements set forth in 21 C.F.R. § 814.20(b)(8)(ii), Endologix was obligated to disclose to the FDA the adverse events and complications with the Nellix EVAS System, as well as any patient or doctor complaints, that occurred domestically or in "foreign" locations, such as Europe where the device had been previously marketed.

45.     Endologix began marketing and selling the Nellix EVAS System on a limited basis in Europe as early as 2013.  Specifically, in January 2013, Endologix announced it had received "CE Mark" approval of the Nellix EVAS

13

System, allowing the Company to commence a limited market introduction of the device in Europe.  CE marking is a mandatory conformity marking for medical devices and other products sold within the European Economic Area.  CE marking generally indicates that a particular product meets the threshold of safety, whereas FDA approval in the United States requires a more stringent and higher showing of ***both safety and effectiveness***.

46.   While Nellix had launched on a limited basis in Europe, it still had to obtain premarket approval from the FDA before it could be marketed and sold domestically in the United States.  In connection with the PMA process, Endologix was required to collect and submit to the FDA human clinical and nonclinical data on the Nellix EVAS System to demonstrate its safety and effectiveness.  Collection of human clinical data is subject to independent FDA Investigational Device Exemption ("IDE") regulations.   An IDE application must be supported by specific, non-human clinical data, including the results of animal and engineering testing.  Only after an IDE application is approved by the FDA can human clinical studies begin on a limited basis (i.e., maximum number of investigational sites and patients.)  The clinical studies must also be conducted under the review of an independent institutional review board to ensure the protection of patients' rights.

47.   In December of 2013, Endologix received IDE approval from the FDA to begin a clinical trial of the Nellix EVAS System in the United States.  The Company commenced the trial ("EVAS Forward IDE") in January 2014.  Enrollment in the trial completed in November 2014.  In May 2016, the Company announced the results of the one-year clinical data from the EVAS Forward IDE, which established Nellix had met the study's primary endpoints for major adverse events at 30 days (safety), and treatment success at one year (effectiveness).  Accordingly, by November 2016, there were two years of data from the EVAS Forward IDE available to Defendants.

48.　　The EVAS Forward IDE consisted of 179 patients at 29 centers in the United States and Europe, of which approximately 25 were in the United States. As part of the clinical trial, each patient would be monitored for one year, after which Endologix would submit the final module of the PMA to the FDA. Endologix received approval to enroll additional patients in the trial in the third quarter of 2015.

49.　　Endologix also conducted an additional international study, known as the "EVAS Forward Global Registry," which was "designed to provide real world clinical results to demonstrate the effectiveness and broad applicability of the Nellix EVAS System."　The Registry was designed to include 300 patients enrolled in up to 30 international centers.　The Company announced the completion of patient enrollment in the EVAS Forward Global Registry in September 2014, and later announced that it would be conducting a follow-up study involving additional patients in November 2016.　By September 2016, two full years of data from the EVAS Forward Global Registry was available to Defendants.

50.　　Against this backdrop, investors and analysts were keenly focused on Endologix's ability to obtain FDA premarket approval of the Nellix EVAS System, and the resulting impact it would have on the Company's revenue stream and growth prospects.　Accordingly, during the Relevant Period, the Individual Defendants sought to reassure the market that the Company was progressing with the PMA process and that Nellix was on track to receive FDA approval by the fourth quarter of 2016, or the early part of 2017, at the latest.

51.　　As it turned out, however, Nellix was not on track to receive FDA approval in the promised timeframe, as there were serious concerns about a "migration" problem affecting the device, which led to delays in the PMA process. Indeed, the Individual Defendants authorized and/or caused Endologix and its senior executives to mislead investors into believing that the rollout of Nellix in

15

Europe was going smoothly, when in fact, there were ongoing reports that patients in Europe who had received treatment with Nellix were experiencing migration issues and facing serious adverse consequences as a result.

52.     According to the FDA, migration occurs when an implanted device moves within the body or is completely expelled from the body.  Migration, if left untreated, can result in a Type I endoleak (blood flow into the aneurysm sac), aneurysm expansion, and rupture in its most catastrophic case.

53.     As set forth in a 2016 case report, doctors in the United Kingdom observed that the Nellix device was prone to migration, which in turn, heightened the risk of endoleaks and other catastrophic consequences.[1]  The case report cited another study which found that the migration rate for the Nellix EVAS System was 17%, compared to the 2.3% migration rate reported by the Company in the Nellix EVAS IDE.  The case report also discussed a patient whose aneurysm was treated with the Nellix EVAS System.  The Nellix EVAS device was removed from the patient after the device migrated and the aneurysm sac expanded, with case study authors noting that "in retrospect, we think that earlier intervention should have been undertaken to mitigate the risk of a catastrophic event."

54.     The study further concluded that "[i]n the absence of a proximal fixation mechanism in EVAS, migration of the Nellix system should represent a more ominous sign, which would complicate a persistent type I endoleak resulting in continued aneurysm growth and inferior translocation of the stents within the aneurysm sac.  EVAS has failed to obliterate the long-term complication seen with conventional endovascular treatment . . . ."

55.     During the Relevant Period, Endologix's senior management attempted to downplay the migration issues that were affecting the device.  During

---

[1] Vasa (2016,) 45(6), 505-07. "Case Report: Nellix stent graft migration after endovascular aneurysm sealing", George A. Antoniou, Khalid Bashaeb, and Riza Ibrahim, published Aug. 29, 2016.

16

a November 1, 2016 conference call with investors and analysts, Defendant McDermott characterized Nellix's migration problem as a recently discovered issue that was a "very easy situation to address."  McDermott gave the impression that the Company was aggressively taking charge of the situation, noting "I think people are giving us a lot of credit for being so proactive and getting out ahead of it.  I will say there are some physicians who think we're being a little conservative.  But our view is, let's think patient safety first, and then we can see some ways to open up these patient criteria moving forward."  McDermott also assured investors that notwithstanding the concerns over migration, "[t]he Nellix PMA approval timelines are unchanged."

56.    The reality was that Endologix's management had known about Nellix's migration problem for quite some time and that it was a serious, ongoing concern that made it impossible for the Company to obtain FDA approval within the promised timeframe.  Notably, during the Relevant Period, the Company had tasked its scientists and researchers to find the cause and solution of the migration problem, but they were unable to do so, therefore making the positive statements about Nellix's supposedly imminent PMA approval even more problematic.

**The Individual Defendants Disseminated and/or Caused the Company to Disseminate False and Misleading Statements During the Relevant Period**

57.    By the beginning of the Relevant Period on May 5, 2016, the Nellix EVAS System was commercially available in Europe on a limited basis for more than three years.  By that time, Defendants were well aware, from information obtained from European patients implanted with the device, that Nellix was migrating, or moving from the location where it was implanted in patients' bodies, potentially leading to catastrophic consequences.  And as noted, Defendants were required to disclose to the FDA the complaints, reports and any other information from Europe evidencing migration consistent with the PMA application requirements of 21 C.F.R. 814.20(b)(8)(ii).

17

58.     Despite their knowledge of this adverse information, on or around May 5, 2016, the Individual Defendants authorized members of Endologix's senior management to present at the Deutsche Bank Health Care Conference, specifically to tout the progress of the Nellix PMA.   During the Conference, Defendant Mahboob assured investors that the Company was on track to receive PMA by the fourth quarter of 2016, or the first quarter of 2017, at the latest:

> A lot of discussion about FDA approval in the U.S.  We published a press release in April that we have submitted all of the four modules at the earnings call in February.  We talked about submitting them within 60 days to 90 days after the earnings call.  We're happy to report that we've submitted all the four modules to the FDA, they have them.  And we have to wait for a 45-day period for the FDA to say that submission is complete, and then the 180-day window starts. ***And if you take that and say that and say 180 days gets you to the October-November time, that's what we've been saying consistently.***

> I get a lot of questions about the panel, and John and our position is that there is nothing in the data that we see today that leads us to believe [] there will be a panel.  But at the end of the day, this is the first PMA approval for EVAS versus EVAR and the agency will do what they have to.  ***But today, we feel pretty good about the timeline that we've been putting out consistently for the last six months to eight months, which is that we expect the approval to be in the Q4 [2016] to latest Q1 [2017] timeframe.***  The one big piece of data is going to be presented at SVS, which is on June 11 here in Boston, is the data for the IDE clinical data, which is going to be presented. And that's going to happen in June.  ***So again, on track from a PMA milestone for a Q4 approval.***

59.     On May 9, 2016, the Individual Defendants caused Endologix to issue a press release announcing the Company's first quarter 2016 financial results for the three-month period ended March 31, 2016 ("Q1 2016").   The Company reported a net loss for Q1 2016 of $47.7 million, or $(0.62) per share, compared with a net loss of $11.2 million, or $(0.17) per share, and pro-forma net loss of $26.9 million for the first quarter of 2015.  The Company also reiterated its full year 2016 financial guidance, noting it expected 2016 revenue to be in the range of $192 million to $202 million.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

60.     In the Q1 2016 press release, Defendant McDermott again confirmed that "[f]or Nellix, we . . . **remain on track with our timeline for potential FDA approval at the end of 2016 or early 2017**."

61.     That same day, the Individual Defendants caused Endologix to host a conference call with analysts and investors, during which Defendants McDermott and Mahboob addressed questions concerning Nellix's overall performance and the Company's efforts to secure PMA for the device.  Responding to an analyst's question about Nellix's performance, Defendant Mahboob stated in part, "**Nellix continues to do a fantastic performance outside of the U.S. . . . So I would say Nellix is doing as expected.  No surprises.**"

62.     When asked by an analyst to provide an update on the "FDA process," Defendant McDermott stated that the Company was on schedule with obtaining PMA approval: "At this point what **I can tell you is the process is clicking ahead on schedule and the interaction [with the FDA] has been constructive**.  So right now everything continues to look like a PMA approval, hopefully, **by the end of this year or first part of next year**."

63.     Also on May 9, 2016, the Individual Defendants caused Endologix to file a quarterly report on Form 10-Q with the SEC for Q1 2016 ("Q1 2016 10-Q"), which was signed by Defendants McDermott and Mahboob.  The Q1 2016 10-Q continued the narrative that Nellix was on track to receive FDA PMA within the promised timeframe by stating: "[w]e recently submitted our final premarket approval ("PMA") modules to the FDA and **remain on schedule for potential PMA approval at the end of 2016 or early 2017.**"

64.     The Q1 2016 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Defendants McDermott and Mahboob, in their respective capacities as CEO and CFO.  The SOX certifications stated that the 10-Q "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 . . ." and "[t]he information contained in

19

the Quarterly Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Defendants McDermott and Davis further signed a separate certification stating, in relevant part:

1.     I have reviewed this quarterly report on Form 10-Q of Endologix, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principals;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

20

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

65.    On August 2, 2016, the Individual Defendants caused Endologix to issue a press release, announcing the Company's financial results for the second quarter of 2016, or the three-month period ended June 30, 2016 ("Q2 2016").  The Company reported a net loss for Q2 2016 of $66.8 million, or $(0.81) per share, compared with a net loss of $13.0 million, or $(0.19) per share, and pro-forma net loss of $27.9 million for the second quarter of 2015.  The Company also raised its full year 2016 revenue guidance, stating it expected 2016 revenue to be in the range of $197 million to $203 million, compared to $192 million to $202 million previously stated.

66.    Significantly, in reporting its results for Q2 2016 in the August 2, 2016 press release, Endologix confirmed the relevance and consideration by the FDA of the Company's experience with patients in Europe, stating: "we are working very collaboratively with the FDA to provide the required information and remain confident in the PMA approval of Nellix based upon the IDE clinical results, data from other international studies and our worldwide experience which now includes over 6,000 patients."

67.    Also, in the Q2 2016 press release, Defendant McDermott stated that the Company's revenue performance in the second quarter was due in part by "strong growth with Nellix in international markets."  McDermott further stated: "[f]or Nellix, we reported several positive clinical data updates during the quarter,

21

highlighted by the results from the EVAS FORWARD-IDE study. These data featured significantly lower rates of endoleaks and secondary interventions with Nellix, which further increases our confidence in its long-term potential to be a market leading device in the treatment of AAA."

68.     Defendant McDermott also provided an update on the progress of the PMA process, stating: "[i]n July, we completed our 100-day PMA meeting with the FDA and remain confident in the approvability of Nellix. The FDA has requested additional information related to our PMA submission and also indicated that we might need to go to an Advisory Committee Panel given the novelty of EVAS compared to traditional EVAR. If we do not have to go to panel, *we still believe it's possible to receive PMA approval in the first quarter of 2017*. If we do have to go to panel, we believe that it pushes out the potential PMA approval into the third quarter of 2017. We are working very collaboratively with the FDA to provide the required information and remain confident in the PMA approval of Nellix based upon the IDE clinical results, data from other international studies and our worldwide experience which now includes over 6,000 patients."

69.     Also on August 2, 2016, the Individual Defendants caused Endologix to host a conference call with analysts and investors to discuss the Company's Q2 2016 financial results. During the conference call, Defendant McDermott stated, "*we remain very positive about the likelihood of approval [for Nellix EVAS System] and the significant growth we expect to drive with Nellix*." Moreover, in response to an analyst's inquiry whether there were any "red flag[s]" concerning the data from the IDE study, McDermott stated that there were no issues with the data, as follows:

> **[Analyst, Stifel Nicolaus & Company]:** Okay, that's very helpful. And I am going to slip in one last question, back on the panel. I'm sure you're eager to provide the intimate details of your FDA discussions. . . . But could you maybe give us a little bit more color, more sense of comfort that there's not something else going on; there was no red flag raised in some of the data that they saw? Anything

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

that you could give us that gives us any comfort there would be helpful. Thank you.

**[McDermott]:** Sure. So, the three reasons that the agency will typically consider sending a device to panel is; one, if there's any new clinical issues of safety or efficacy. And, obviously, *everyone has seen the data so we know there aren't any issues there*. The second reason is if they feel, the FDA feels they don't have the clinical or technical expertise to complete the review of the PMA. That's not the case. So, the third is if it's novel technology.

70. Further, during the August 2, 2016 conference call, Defendant McDermott assured investors that the PMA process was not being held up by FDA inquiries into the clinical data from the IDE study and downplayed the risk that the FDA would not approve the device:

**[Analyst, BMO Capital Markets]:** Hi. Can we talk a little bit about what type of additional data or questions that you're receiving? I mean is there any way to give us some information regarding that?

**[McDermott]:** Yes, I don't want to get too detailed with that, Joanne. *What I can tell you is that none of the questions we got asked are what I would characterize as big surprises.* There's clarification on some things, some requests for additional analysis, some additional testing. *Nothing that would suggest, in our view, any question or risk of approvability; just some more blocking and tackling and clarification of the data we submitted. So, we don't see anything in there that's giving us heartburn.* It will just take a little time to pull it all together. And we'd also like to take another run at this novelty question and see if we can provide the agency with enough evidence that the device isn't novel so that we don't have to go to panel. So, that will be the focus of the work we do over the next few months.

71. Notably, McDermott admitted during the August 2, 2016 conference call that Endologix had followed the requirements of 21 C.F.R. 814.20(b)(8)(ii) and did in fact submit to the FDA the adverse events and complications with the Nellix EVAS System, as well as any patient or doctor complaints that occurred in Europe. Alternatively, if the Individual Defendants did not do so, they intentionally and illegally lied to the FDA by withholding information legally required to be disclosed, thereby submitting a false PMA application. At the very least, the evidence from Europe regarding migration was required to be disclosed

23

in order to make the positive statements about Nellix's safety and approvability not misleading.

72.     A few days later, on August 10, 2016, the Individual Defendants caused representatives of Endologix to attend the Canaccord Genuity Growth Conference.    During the Conference, Defendant McDermott touted the groundbreaking nature of Nellix and continued to convey that the PMA process was advancing within the stated timeframe.  McDermott stated:

> So that's why when—if you do any work or talk to physicians, there's quite a lot of buzz about Nellix coming to market.  So, that said, we announced on our call last week that we've completed our FDA trial. The data has been presented.
>
> Now we are in our discussions with the FDA.  All of the modules have been submitted.   We are completed with our FDA audits. ***Things are clicking along pretty nicely***.

73.     On November 1, 2016, the Individual Defendants caused Endologix to issue a press release, announcing the Company's financial results for the third quarter of 2016, or the three-month period ended September 30, 2017 ("Q3 2016").  The Company reported a net loss for Q3 2016 of $15.2 million, or $(0.18) per share, compared with a net loss of $10.9 million, or $(0.16) per share, and pro-forma net loss of $24.5 million for the third quarter of 2015.

74.     Later that day, the Individual Defendants caused Endologix to host a conference call with investors and analysts to discuss the Company's Q3 2016 financial results.   During the Q3 2016 conference call, Defendant McDermott again provided assurances that the PMA process was progressing as promised:

> In terms of the US PMA, we achieved the clinical endpoints in the IDE and have shared the latest clinical data with FDA.  We've also provided them with our updated patient selection criteria and have had positive discussions so far.  The Nellix PMA approval timelines are unchanged, although we think a panel is more likely now, given the updated indications.

75.     During the November 1, 2016 conference call, Endologix's senior management addressed the issue of migration.  Defendant McDermott falsely

conveyed that the migration problems affecting Nellix had only recently come to the Company's attention:

> Regarding Nellix, ***we recently ran an updated data cut from the IDE clinical database, and noticed an increase in migration in aneurysm enlargement in some patients with 2-year follow-up.*** We've learned that migration with Nellix can occur in patients with small flow lumens and a lot of thrombus, because there isn't enough space to inject sufficient polymer to support the stents. ***Our solution is a simple update to the patient selection criteria*** that measures the ratio of an aneurysm diameter to the flow lumen, to ensure there's enough space for polymer.

> \*      \*      \*

> When we examined the IDE data for patients that fit within this updated selection criteria, ***we see extremely positive safety and durability results out to 2 years***, which gives us confidence that Nellix can be a leading device in the treatment of abdominal aortic aneurysms.

76.     Defendant McDermott went on to emphasize Endologix's favorable interactions with the FDA, reassuring investors that any concerns related to migration were minimal by stating in part: "we did have a successful clinical study and met the endpoints in the trial.  So actually, when we've interacted with the agency so far on the updated indications, they've responded favorably. ***They had some questions about migration and a curiosity if it was progressive. . . . We can't really get into any of the data details at this point in time. . . . But what I can tell you is that the re-interventions related to this issue are extremely low.***"

77.     Defendant McDermott further stated that the issue of migration was "***a very easy situation to address*** just by narrowing for those particular anatomies," adding that "I think people are giving us a lot of credit for being so proactive and getting out ahead of it.  I will say there are some physicians who think we're being a little conservative.  But our view is, let's think patient safety first, and then we can see some ways to open up these patient criteria moving forward."

78.     On November 8, 2016, the Individual Defendants caused Endologix to file a quarterly report on Form 10-Q with the SEC for Q3 2016 ("Q3 2016 10-Q"), signed by Defendants McDermott and Mahboob.  The Q3 2016 10-Q

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

continued to provide the impression that Nellix was on track to receive FDA PMA within the promised timeframe, stating in part: "[w]e are working collaboratively and in a timely manner with the FDA to provide the required information, ***and we remain confident that we will receive PMA approval for Nellix EVAS System based upon the IDE clinical results, data from other international studies and our worldwide experience***, which now includes over 7,000 patients."

79.    The Q3 2016 10-Q contained certifications, signed by McDermott and Mahboob, that were similar to the certifications described in paragraph 64, attesting the accuracy and completeness of the financial report.

## **THE REASONS WHY THE STATEMENTS WERE IMPROPER**

80.    The statements referenced above were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts.   The true facts, which were known or recklessly disregarded by the Individual Defendants but were concealed from the investing public, were as follows:

        (a)    the Nellix EVAS System was not on track for FDA approval by the end of 2016, or the early part of 2017, at the latest, due to the severe problems with migration which made the device ineligible for FDA approval;

        (b)    the migration problems affecting the Nellix EVAS System was not a recently discovered issue, but rather, a long-term concern known to the Company;

        (c)    there was no "easy" or "simple" fix for the migration problem affecting the Nellix EVAS System; rather, the problem was so severe that the Company had to totally abandon its efforts to obtain PMA approval of the first generation of the device;

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

(d)    the Nellix EVAS System was not as safe and effective as claimed by Defendant McDermott and other senior executives at the Company; and

(e)    based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

81.    As a result of the Individual Defendants' false and misleading statements and omissions, Endologix shares traded at artificially inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing hundreds of millions of dollars in market capitalization.

## THE TRUTH EMERGES

82.    On November 16, 2016, in advance of the Company's 2016 Investor Meeting, Endologix issued a press release entitled "Endologix Provides Update on Nellix PMA Process."  The press released revealed for the first time that the Nellix EVAS System would not be receiving FDA approval within the previously promised timeline.  It was further revealed in the press release that the FDA had requested the Company to provide two-year patient follow-up data from the Nellix EVAS Forward IDE Study.  This meant that potential premarket approval of Nellix could not occur until the second quarter of 2018, delaying approval for at least an additional 18 months from the time the Company had previously announced.

83.    McDermott was quoted in the press release as saying: "[w]e're disappointed by these requirements and the resulting delay, but encouraged by the 2-year clinical outcomes we have seen so far with Nellix under our newly revised instructions for use.  We remain committed to EVAS with Nellix and have demonstrated outstanding clinical results in selected patients with both traditional and complex AAA anatomies."

84.     The market responded negatively to this shocking announcement, and the price of Endologix stock fell $2.02 per share, or over 20.5%, to close at $7.82 per share on November 16, 2016.

85.     During the Company's 2016 Investor Meeting held the next day, Defendant McDermott provided additional information concerning the delay of the PMA process and explained that the FDA's request for additional data stemmed from concerns over migration:

> **[Analyst, RTC]:** Can you share with us were there migration issues in that subset of patients that the FDA already saw and is that why they're saying give me the two years for everybody?
>
> **[McDermott]:** Yes.  So everybody saw the one-year data which was 2.3% of patients had a 10 millimeter migration or more at one year. What we saw was when we did an updated data cut for our response, some of those patients went on to migrate more and there were some patients that hadn't displayed any migration at one year that showed signed of migration in year two.
>
> And although most of those findings were still hadn't triggered interventions, there were some and I'm not going to tell you there were zero intervention.  I honestly, right now, don't know the exact number off the top of my head, but it was really the change in the rate. It was the increase in the rate from year one to year two and that's what drove the discussion.

86.     Months later, on May 17, 2017, Endologix delivered the coup de grâce when it finally revealed that after meeting with the FDA, the Company would not be seeking approval of the first generation Nellix EVAS System at all. Instead, the Company announced it would be seeking approval of an altogether new version of the device—the "Gen2" Nellix EVAS System.  This required a completely separate clinical trial, which in turn, would push the timeline for approval of the Nellix EVAS System all the way out to 2020.

87.     In the May 17, 2017 press release entitled "Endologix Provides an Update on the Nellix Endovascular Aneurysm Sealing System U.S. Regulatory Status," Endologix informed investors that it had met with the FDA and that "based upon that meeting and further internal analysis, the company has determined that it will seek U.S. approval of the Nellix® EVAS System by

28

conducting a confirmatory clinical study with the previously updated Instructions for Use (IFU) and the Gen2 device design . . . .  The Company will collaborate with the FDA over the coming months on the confirmatory clinical study protocol and anticipates beginning patient enrollment in the fourth quarter of this year with PMA approval estimated to occur in 2020."

88.     On the heels of this bombshell announcement, the price of Endologix stock declined more than $2.47 per share, or 36%, from their closing price of $6.73 on May 17, 2017, to close at $4.26 on May 18, 2017.

**THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9, IN FURTHER BREACH OF THEIR FIDUCIARY DUTIES**

89.     The Director Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Endologix to issue proxy statements containing materially false and misleading statements.  The Director Defendants' failure to disclose material facts in the proxy statements likewise constitutes a breach of their fiduciary duties.  Plaintiffs expressly disclaim any fraud or intentional wrongdoing as to the proxy statement claims, as the claims are based solely on the Director Defendants' negligent actions.

**The Director Defendants Caused Endologix to Issue the Materially False or Misleading 2016 Proxy Statement**

90.     On May 2, 2016, the Director Defendants caused Endologix to file a proxy statement on Schedule 14A with the SEC (the "2016 Proxy Statement") in connection with the 2016 annual stockholders meeting to be held on June 2, 2016. In the 2016 Proxy Statement, the Director Defendants solicited stockholder votes to re-elect the "Class III" directors, namely Defendants Waller, Wilder, and Zenty, and to approve the compensation of the Company's executive officers, among other proposals.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

91. With respect to the proposal to re-elect certain directors, the 2016 Proxy Statement contained the following statements in the section entitled "Board of Directors Involvement in Risk Oversight":

Our board of directors oversees our risk management practices and strategies, taking an enterprise-wide approach to risk management that seeks to complement our organizational and strategic objectives, long-term performance and the overall enhancement of stockholder value. Our board's approach to risk management includes developing a detailed understanding of the risks we face, analyzing them with the latest information available, and determining the steps that should be taken to manage those risks, with a view toward the appropriate level of risk for a company of our size and financial condition.

While our board of directors has the ultimate responsibility for the risk management process, senior management and various committees of our board of directors also have responsibility for certain areas of risk management.

Our senior management team is responsible for day-to-day risk management and regularly reports on risks to our full board of directors or a relevant committee. Our legal, finance and regulatory areas serve as the primary monitoring and evaluation function for company-wide policies and procedures, and manage the day-to-day oversight of the risk management strategy for our ongoing business. This oversight includes identifying, evaluating, and addressing potential risks that may exist at the enterprise, strategic, financial, operational, compliance and reporting levels.

The Audit Committee focuses on financial compliance risk, working closely, for example, with management and our independent registered public accounting firm. The Compensation Committee assesses risks related to our compensation programs. In setting performance metrics, our Compensation Committee creates incentives for our senior executives that encourage an appropriate level of risk-taking that is commensurate with our short-term and long-term strategies. The Nominating, Governance and Compliance Committee monitors our compliance with all legal and regulatory requirements that affect our company and works closely with our internal compliance officers and outside legal counsel to identify and assess key operational risks related to legal and regulatory compliance, as well as appropriate mitigation strategies.

92. The 2016 Proxy Statement went on to describe the specific responsibilities and duties of the Audit Committee of the Board as follows:

The Audit Committee has the sole authority to appoint and, when deemed appropriate, replace our independent registered public accounting firm, and has established a policy of pre-approving all audit and permissible non-audit services provided by our independent registered public accounting firm. The Audit Committee has, among other things, the responsibility to:

30

- review and approve the scope and results of the annual audit;

- evaluate with the independent registered public accounting firm the performance and adequacy of our financial personnel and the adequacy and effectiveness of our systems and internal financial controls;

- review and discuss with management and the independent registered public accounting firm the content of our financial statements prior to the filing of our quarterly reports on Form 10-Q and annual reports on Form 10-K;

- establish procedures for receiving, retaining and investigating reports of illegal acts involving us or complaints or concerns regarding questionable accounting or auditing matters;

- establish procedures for the confidential, anonymous submission by our employees of concerns or complaints regarding questionable accounting or auditing matters; and

- assist our board of directors in its oversight of our compliance with legal and regulatory requirements.

93.     The foregoing statements conveyed that the Board maintained sufficient and adequate risk management, financial compliance, and audit oversight programs and procedures. The 2016 Proxy Statement, however, omitted any disclosures concerning: (i) the Company's inadequate internal and disclosure controls; (ii) the Company's reporting failures concerning the performance of the Nellix EVAS System, the migration problems that plagued the device, and the Company's inability to obtain PMA for the device; and (iii) the Board-approved compensation programs that incentivized the reporting failures.

94.     The 2016 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to certain senior executives, including Defendants McDermott and Mahboob. In soliciting approval of the so-called "say-on-pay" compensation proposal, the 2016 Proxy Statement stated:

> Our executive compensation practices are designed to attract, retain and reward our executives and strengthen the mutuality of interests between our executives and our stockholders in order to motivate our executives to maximize stockholder value. The primary goals of our executive compensation program are to motivate our executive

31

1
2
3

officers to cause us to achieve the best possible financial and operational results, to attract and retain high quality executives who can provide effective leadership, consistency of purpose and enduring relations with relevant stockholders and to align the long-term interests of our executive officers with those of our stockholders.

4
5
6
7
8
9
10

Our executive compensation program primarily consists of a base salary, cash incentive payments upon the achievement of corporate objectives and time-and performance-based equity incentive awards, which are generally in the form of stock options and restricted stock unit awards.  The equity component of our compensation program is designed to align a portion of each executive officer's compensation with the interests of our stockholders to create long term value.  We encourage you to carefully review the section entitled "Compensation Discussion and Analysis" in this proxy statement for additional information on our executive compensation programs and practices, as well as the Summary Compensation Table and other related compensation tables and narrative disclosure, which describe the compensation of our named executive officers.

11
12

We are asking our stockholders to indicate their support for the compensation of our named executive officers as described in this proxy statement.

13
14
15
16
17
18
19
20

95.    The foregoing statements conveyed that Endologix's compensation system encouraged proper risk management, the achievement of the "best possible financial and operational results," and the alignment of the long-term interests of the Company's executive officers with those of its stockholders.  In reality, the Company's compensation system encouraged—and consistently rewarded—the non-disclosure and inadequate reporting of material information concerning the Company's operations, financial performance, and other business concerns like the Nellix EVAS System.

21
22
23

96.    The 2016 Proxy Statement also misrepresented and/or failed to disclose that the Nellix EVAS System was not on track for FDA approval in fourth quarter 2016 due to the severe, longstanding problems with migration.

24
25
26
27
28

97.    The 2016 Proxy Statement harmed Endologix by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  Indeed, many Endologix stockholders, deprived of the material information described above, later voted to re-elect the slate of proposed directors and support the say-on-pay compensation proposal.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

**The Director Defendants Caused Endologix to Issue the Materially False or Misleading 2017 Proxy Statement**

98.     On May 1, 2017, the Director Defendants caused Endologix to file the file a proxy statement on Schedule 14A with the SEC (the "2017 Proxy Statement") in connection with the 2017 annual stockholders meeting to be held on May 31, 2017.  In the 2017 Proxy Statement, the Director Defendants solicited stockholder votes to re-elect the "Class I" directors, namely Defendants Lemaitre and Norwalk, and approve the compensation of the Company's executive officers, among other proposals.  However, the 2017 Proxy Statement contained materially misleading statements with respect to the solicited votes.

99.     With respect to the proposal to re-elect certain directors, the 2017 Proxy Statement contained the following statements in the section entitled "Board of Directors Involvement in Risk Oversight":

> Our board of directors oversees our risk management practices and strategies, taking an enterprise-wide approach to risk management that seeks to complement our organizational and strategic objectives, long-term performance and the overall enhancement of stockholder value.  Our board's approach to risk management includes developing a detailed understanding of the risks we face, analyzing them with the latest information available, and determining the steps that should be taken to manage those risks, with a view toward the appropriate level of risk for a company of our size and financial condition.

> While our board of directors has the ultimate responsibility for the risk management process, senior management and various committees of our board of directors also have responsibility for certain areas of risk management.

> Our senior management team is responsible for day-to-day risk management and regularly reports on risks to our full board of directors or a relevant committee.  Our legal, finance and regulatory areas serve as the primary monitoring and evaluation function for company-wide policies and procedures, and manage the day-to-day oversight of the risk management strategy for our ongoing business.  This oversight includes identifying, evaluating, and addressing potential risks that may exist at the enterprise, strategic, financial, operational, compliance and reporting levels.

> The Audit Committee focuses on financial compliance risk, working closely, for example, with management and our independent registered public accounting firm.  The Compensation Committee assesses risks related to our compensation programs.  In setting

33

performance metrics, our Compensation Committee creates incentives for our senior executives that encourage an appropriate level of risk-taking that is commensurate with our short-term and long-term strategies. The Nominating, Governance and Compliance Committee monitors our compliance with all legal and regulatory requirements that affect our company and works closely with our internal compliance officers and outside legal counsel to identify and assess key operational risks related to legal and regulatory compliance, as well as appropriate mitigation strategies.

100. The 2017 Proxy Statement also described the specific responsibilities and duties of the Audit Committee of the Board as follows:

The Audit Committee has the sole authority to appoint and, when deemed appropriate, replace our independent registered public accounting firm, and has established a policy of pre-approving all audit and permissible non-audit services provided by our independent registered public accounting firm. The Audit Committee has, among other things, the responsibility to:

- review and approve the scope and results of the annual audit;

- evaluate with the independent registered public accounting firm the performance and adequacy of our financial personnel and the adequacy and effectiveness of our systems and internal financial controls;

- review and discuss with management and the independent registered public accounting firm the content of our financial statements prior to the filing of our quarterly reports on Form 10-Q and annual reports on Form 10-K;

- establish procedures for receiving, retaining and investigating reports of illegal acts involving us or complaints or concerns regarding questionable accounting or auditing matters;

- establish procedures for the confidential, anonymous submission by our employees of concerns or complaints regarding questionable accounting or auditing matters; and

- assist our board of directors in its oversight of our compliance with legal and regulatory requirements.

101. The foregoing statements in the 2017 Proxy Statements misleadingly conveyed that the Board maintained sufficient and adequate risk management, financial compliance, and auditing oversight programs and procedures. The 2017 Proxy Statement, however, omitted material disclosures concerning: (i) the Company's inadequate internal and disclosure controls; (ii) the reporting failures

34

concerning the performance of the Nellix EVAS system, the migration problems that plagued the device, and the Company's inability to timely obtain PMA for the device; and (iii) the Board-approved compensation programs that incentivized the reporting failures.

102.   The 2017 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to certain senior executives, including Defendants McDermott and Mahboob.  In soliciting approval of the so-called "say-on-pay" compensation proposal, the 2017 Proxy Statement stated:

> Our executive compensation practices are designed to attract, retain and reward our executives and strengthen the mutuality of interests between our executives and our stockholders in order to motivate our executives to maximize stockholder value.  The primary goals of our executive compensation program are to motivate our executive officers to cause us to achieve the best possible financial and operational results, to attract and retain high quality executives who can provide effective leadership, consistency of purpose and enduring relations with relevant stockholders and to align the long-term interests of our executive officers with those of our stockholders.

> Our executive compensation program primarily consists of a base salary, cash incentive payments upon the achievement of corporate objectives and time-and performance-based equity incentive awards, which are generally in the form of stock options and restricted stock unit awards.  The equity component of our compensation program is designed to align a portion of each executive officer's compensation with the interests of our stockholders to create long term value.  We encourage you to carefully review the section entitled "Compensation Discussion and Analysis" in this proxy statement for additional information on our executive compensation programs and practices, as well as the Summary Compensation Table and other related compensation tables and narrative disclosure, which describe the compensation of our named executive officers.

> We are asking our stockholders to indicate their support for the compensation of our named executive officers as described in this proxy statement.

103.   The foregoing statements in the 2017 Proxy Statement misleadingly conveyed that Endologix's compensation system encouraged proper risk management, the achievement of the "best possible financial and operational results," and the alignment of the long-term interests of the Company's executive officers with those of its stockholders.  In reality, the Company's compensation

35

system encouraged—and consistently rewarded—the non-disclosure and inadequate reporting of material information concerning the Company's operations, financial performance, and other business concerns including the Nellix EVAS System.

104. The 2017 Proxy Statement also misrepresented and/or failed to disclose that the Nellix EVAS System was not on track for FDA approval in the promised timeframe, due to the severe, longstanding problems with migration.

105. The 2017 Proxy Statement harmed Endologix by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the Director Defendants' misleading statements in the 2017 Proxy Statement, Endologix's stockholders voted to re-elect Defendants Lemaitre and Norwalk.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

106. By reason of their positions as officers, directors, and/or fiduciaries of Endologix, and because of their ability to control the business and corporate affairs of Endologix, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Endologix in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Endologix and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

107. Each director and officer of the Company owes to Endologix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

108.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

109.   In addition to these duties, the members of Endologix's Audit Committee (Defendants Lemaitre, Waller and Wilder) owed specific duties to the Company under its Audit Committee Charter, including reviewing and approving quarterly and annual financial statements and earnings press releases, and ensuring that the Company had appropriate and effective internal controls over financial reporting.

110.   According to the Audit Committee Charter, the Audit Committee was formed to:

(1)     Assist the Board in fulfilling its responsibilities relating to the oversight of:

(a)     the integrity of the financial statements of the Company,

(b)     the independent auditor's qualifications and independence,

(c)     the performance of the Company's independent auditors, and

(d)     the compliance by the Company with legal and regulatory requirements;

(2)     Prepare the audit committee report that the rules of the Securities and Exchange Commission (the "Commission") require to be included in the Company's annual proxy statement; and

(3)     To provide such other assistance that the Board, from time to time, requests.

111.   Specifically, with respect to financial statement and disclosure matters, the members of the Audit Committee owed the following specific duties to Endologix under the Audit Committee Charter:

37

1.     Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.     Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

3.     Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting.

4.     Discuss with management any major issues as to the adequacy of the Company's disclosure controls and procedures and internal control over financial reporting and any special steps adopted in light of material control deficiencies. Discuss with external auditors any significant matters regarding internal control over financial reporting that have come to their attention during the conduct of the audit.

5.     Review and discuss with the Company's independent auditor and management, at least annually, reports from the independent auditor on:

    (a)     All critical accounting policies and practices used by the Company and those which the Company intends to use.

    (b)     All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

    (c)     Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

6.     Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. The chair of the Committee may represent the entire Committee for purposes of this review. The discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

7.     Discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

8.     Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

9.     Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

10.     Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

11.     Review management's report on internal control over financial reporting and the independent auditors' attestation and report on management's internal control over financial reporting to be included in the Company's Annual Report on Form 10-K prior to its filing with the Commission.

112.     Further, under the Audit Committee Charter, the members of the Audit Committee owed duties to Endologix concerning compliance oversight, including the following responsibilities:

1.     Obtain from the independent auditor assurance that all communications required by Section 10A(b) of the Exchange Act have been made.

2.     Obtain reports from management that the Company and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Ethics for the CEO and senior financial officers.

3.     Obtain reports from the Company's Compliance Officer regarding conformity of the Company's operations with the Company's Comprehensive Compliance Program and Code of Ethics for Interactions with Health Care Professionals, including applicable state laws.

4.     Confirm with the independent auditors that nothing has come to their attention during the course of their work with the Company that the Company may not be in compliance with applicable legal requirements.

5.     Review reports and disclosures of insider and affiliated party transactions.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

6.      Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Ethics for the CEO and senior financial officers and with the Comprehensive Compliance Program and Code of Ethics for Interactions with Health Care Professionals.  Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing or compliance matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, auditing or compliance matters.

7.      Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

8.      Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

9.      Perform any other activities consistent with this Charter as the Committee or the Board deems necessary or appropriate.

113.   Upon information and belief, throughout the Relevant Period, Endologix maintained an Audit Committee Charter (or charters) that was (or were) materially and substantially the same in substance as the Company's current Charter described herein.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

114.   Additionally, the Individual Defendants, as officers and/or directors of Endologix, were bound by the Company's Code of Business Conduct and Ethics (the "Code"), which was comprised of multiple compliance documents and industry codes of ethics, as specifically referenced on the Company's corporate website, including the following: (i) Compliance Declaration, (ii) Comprehensive Corporate Compliance Program, (iii) Employee Communication Channels, (iv) Global Business Conduct Standards with Health Care Professionals, (v) AdvaMed Code of Ethics, and (vi) MedTech Europe Code of Ethical Business Practice.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

115.   As stated in the Compliance Declaration of the Code, representatives of Endologix, including the Individual Defendants, were obligated to hold themselves to the "highest standards of business conduct," "comply with the many laws and regulations that affect [the Company's] activities worldwide," and demand "honesty and ethical behavior in all that [the Company does]."  Based on information and belief, the foregoing Declaration was made in May 2016, and again in May 2017.

116.   Upon information and belief, the Company maintained versions of the documents that comprised the Code during the Relevant Period, which imposed the same, or substantially and materially the same or similar, duties on, among others, the Board, as those set forth above.

**Control, Access, and Authority**

117.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Endologix, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Endologix.

118.   Because of their advisory, executive, managerial, and directorial positions with Endologix, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Endologix.

119.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Endologix, and was at all times, acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

120.   To discharge their duties, the officers and directors of Endologix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

of such duties, the officers and directors of Endologix were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Endologix conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Endologix was operated in a diligent, honest, and prudent manner and ensure compliance with all applicable laws, rules, and regulations.

## **BREACHES OF DUTIES**

121. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Endologix and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Endologix, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of

their obligations as directors and officers of Endologix, the absence of good faith on their part, and a reckless disregard for their duties to Endologix and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to Endologix.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants, who collectively comprised the entirety of Endologix's Board.

122.   The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

123.   In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, Endologix has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

124.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

125. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct designed to mislead shareholders into believing the Company's business and financial prospects were better than they were.  In furtherance of this plan, conspiracy, and course of

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

conduct, the Individual Defendants collectively and individually took the actions set forth herein.

126.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

127.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

128.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO ENDOLOGIX

129.   As a result of the Individual Defendants' wrongful conduct, Endologix disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Endologix's credibility.  Endologix has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

130.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Endologix's market capitalization has been substantially damaged, having lost hundreds of millions of dollars in value, as a result of the conduct described herein.

131.    Further, as a direct and proximate result of the Individual Defendants' conduct, Endologix has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending Endologix and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Endologix's artificially-inflated stock price; and

(c)    costs incurred from the loss of the Company's customers' confidence in Endologix's products and services.

132.    Moreover, these actions have irreparably damaged Endologix's corporate image and goodwill.  For at least the foreseeable future, Endologix will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Endologix's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

133.    Plaintiffs bring this action derivatively in the right and for the benefit of Endologix to redress injuries suffered, and to be suffered, by Endologix as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Endologix is named as a nominal defendant solely in a derivative capacity.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

134.   Plaintiffs will adequately and fairly represent the interests of Endologix in enforcing and prosecuting its rights.

135.   Plaintiffs were shareholders of Endologix common stock at the time of the wrongdoing of which Plaintiffs complain and have been continuously since.

136.   Plaintiffs did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

137.   At the time this action was commenced and at the time of filing this consolidated complaint, the Board of Endologix consisted of the following eight (8) directors: Defendants Lemaitre, McDermott, Chavez, Neels, Norwalk, Waller, Wilder, and Zenty.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Notably, all of these individuals face a substantial likelihood of personal liability for their violations of Section 14a of the Exchange Act and breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.  Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

**Demand is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability**

138.   Director Defendants Lemaitre, McDermott, Chavez, Neels, Norwalk, Waller, Wilder, and Zenty face a substantial likelihood of liability for their individual misconduct.  As alleged herein, each of the Director Defendants violated Section 14(a) of the Exchange Act by negligently making the misstatements and omissions in the 2016 and 2017 Proxy Statements. Accordingly, demand is excused because each member of the Board at the time this action was commenced faces a substantial likelihood of liability

139.   The Director Defendants also breached their fiduciary duties of loyalty, good faith, and candor by causing or allowing improper statements to be

46

made in the Company's press releases, investor conference calls and presentations, and SEC filings regarding the Nellix EVAS System and the ability of the Company to obtain FDA premarket approval for the device.

140.   Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused Endologix's stock to trade at artificially-inflated prices.

141.   The Director Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

142.   The Director Defendants' making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which they face a substantial likelihood of liability.  If the

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

Director Defendants were to bring a suit on behalf of Endologix to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

143. Pursuant to the Audit Committee Charter, Audit Committee Defendants Lemaitre, Waller, and Wilder were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Endologix's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing, the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

**Demand is Futile as to Defendant McDermott**

144. Demand is futile as to Defendant McDermott, as Endologix admits McDermott does not meet the standards for director independence, given his current role as CEO of the Company.

145. McDermott also cannot disinterestedly consider a demand to bring suit against himself because McDermott is a named defendant in the Securities Class Action, which alleges that he made many of the same misstatements described above in violation of the federal securities laws. Thus, if McDermott were to initiate suit in this action, he would compromise his ability to

48

1  simultaneously defend himself in the Securities Class Action and would expose
2  himself to liability in this action.  This he will not do.

3      146.  McDermott is also interested, and therefore not independent or
4  disinterested, because he has financially benefitted from his own wrongdoing and
5  the wrongdoing of the other Individual Defendants, and because his livelihood
6  continues to depend on compensation from Endologix.  For example, in 2016, at a
7  time when he was making and causing Endologix to make material misstatements
8  concerning the Nellix EVAS System and the Company's efforts to obtain FDA
9  PMA for the device, McDermott received more than $3.2 million in total
10 compensation from Endologix, including salary, bonus, stock awards, option
11 awards, and other compensation.  As such, McDermott cannot independently
12 consider any demand to sue himself for breaching his fiduciary duties to Endologix
13 because that would expose him to liability and threaten his livelihood.

14 **Demand is Futile as to All Director Defendants for Additional Reasons**

15     147.  The Board of Endologix has already demonstrated that it cannot
16 independently and disinterestedly consider a pre-suit demand to bring the claims
17 set forth herein.  Despite the wrongdoing of the Company's executive officers,
18 including Defendants McDermott and Mahboob, who, respectively, still serve as
19 the Company's CEO and CFO, the Board has taken no action to address the harm
20 this misconduct has caused the Company.

21     148.  Each of the current directors receives an annual cash compensation,
22 as well as awards of Endologix stock, purely for being a Board member.  This
23 compensation provides a substantial stipend to these directors, from which each of
24 them personally benefits and depends on for his or her livelihood.  Demand on
25 each of the directors is futile because, through their course of conduct to date, they
26 have demonstrated their unwillingness to undertake any action that would threaten
27 the economic benefits they receive as members of Endologix's Board.

28

49

149.   If Endologix's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders.   However, Plaintiffs are informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Endologix against the Director Defendants, known as the "insured versus insured exclusion."

150.   As a result, if the members of Endologix's Board were to sue themselves or certain officers of Endologix, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.   Therefore, the members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

151.   Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting Endologix by prosecuting this action.   Therefore, demand on Endologix and its Board is futile and is excused.

152.   Endologix has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing.   Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.   Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

153.   Plaintiffs have not made any demand on shareholders of Endologix to institute this action since such demand would be a futile and useless act for the following reasons:

(a)   Endologix is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b)   making demand on such a number of shareholders would be impossible for Plaintiffs, who at this time have no means of collecting the names, addresses, or phone numbers of Endologix shareholders; and

(c)   making demand on all shareholders would force Plaintiffs to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

**COUNT I**

**Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

154.   Plaintiffs hereby incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

155.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

156.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC]

51

may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

157.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

158.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2016 and 2017 Proxy Statements.  The 2016 and 2017 Proxy Statements contained proposals, inter alia, to Endologix's stockholders urging stockholders to re-elect certain directors to the Board and approve the compensation of the Company's executive officers.  The 2016 and 2017 Proxy Statements, however, misstated or failed to disclose: (i) the Company's inadequate internal and disclosure controls; (ii) the Company's reporting failures concerning the performance of the Nellix EVAS System, the migration problems that plagued the device, and the Company's inability to obtain PMA for the device; (iii) the Board-approved compensation programs that encouraged the non-disclosure and inadequate reporting of material information; and (iv) that the Nellix EVAS System was not on track for FDA approval due to the severe, longstanding problems with migration.

159.   By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of the Director Defendants' wrongful conduct, Endologix misled and/or deceived its stockholders by making misleading statements that were an essential link in

stockholders heeding Endologix's recommendation to re-elect certain directors to the Board and approve certain executive compensation.

160.   The misleading information contained in the 2016 and 2017 Proxy Statements was material to Endologix's stockholders in determining whether to elect certain directors to the Board and approve certain executive compensation. This information was also material to the integrity of those directors that were proposed for election to the Board.

161.   Plaintiffs, on behalf of Endologix, thereby seek relief for damages inflicted upon the Company based upon the misleading Proxy Statements.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

162.   Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.   The Individual Defendants owed, and owe, fiduciary obligations to Endologix.  By reason of their fiduciary relationships, the Individual Defendants owed, and owe, Endologix the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

164.   Based on the misconduct alleged herein, the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

165.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Endologix has sustained significant

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167.   Plaintiffs, on behalf of Endologix, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

168.   Plaintiffs hereby incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

169.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of Endologix.

170.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Endologix.

171.   Plaintiffs, as shareholders and representatives of Endologix, seek restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

172.   Plaintiffs, on behalf of Endologix, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

173.   Plaintiffs hereby incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

174.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

175.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock

54

options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

176.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

177.   Plaintiffs, on behalf of Endologix, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment and waste of corporate assets;

B.   Directing Endologix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Endologix and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to appropriately test and strengthen the Company's internal reporting and financial disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

- a proposal to strengthen the Board's oversight and monitoring of the safety and efficacy of the medical devices designed, marketed and sold by the Company;

55

- a proposal to strengthen the Board's oversight over the Company's participation in and compliance with FDA regulatory approval processes (including the PMA process and IDE), as well as international regulatory requirements;

- a proposal to proposal to de-classify the Company's Board and calling for each director to stand for election to the Board annually;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Endologix's directors, executives, and other employees;

- a provision to permit the shareholders of Endologix to nominate at least three candidates for election to the Board to replace existing directors; and

- a proposal to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets to as to assure that Plaintiffs on behalf of Endologix has an effective remedy;

D.      Awarding to Endologix restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Respectfully Submitted,

Dated: February 28, 2018

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
PHONG L. TRAN

By: */s/ Frank J. Johnson*

FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonfistel.com
phongt@johnsonfistel.com

*Lead Counsel for Plaintiffs*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Lead Case No.: 8:17-cv-01155-AB (PLAx)

# **VERIFICATION**

I, Paul Green, verify that I have reviewed the foregoing Consolidated Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: February 16, 2018

_____
(Signature of Paul Green)

DocuSign Envelope ID: FC971D34-5EAD-4F96-A7C3-DA04F6498961

# **VERIFICATION**

I, Nick Cocco, verify that I have reviewed the foregoing Consolidated Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: February 16, 2018

_____

(Signature of Nick Cocco)